UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY ELIZABETH LANE,<br><br>                                    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                                    Defendant. | Case No.:  18cv2407-WQH (NLS)<br><br>**REPORT AND RECOMMENDATION FOR ORDER:**<br><br>**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MOTION FOR REMAND [ECF Nos. 14, 15]; and**<br><br>**(2) GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT [ECF No. 17]** |

Mary Elizabeth Lane ("Plaintiff") brings this action under the Social Security Act. *See* 42 U.S.C. § 405(g).  Plaintiff seeks judicial review of the Social Security Administration's ("Defendant") final decision denying her claim for disability insurance benefits under Title II of the Social Security Act.  ECF No. 1.  This case was referred for a report and recommendation on the parties' cross motions for summary judgment.  ECF No. 16; *see* 28 U.S.C. § 636(b)(1)(B).  After considering the papers submitted, the administrative record, and the applicable law, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment and motion to remand be **DENIED** and that Defendant's

cross motion for summary judgment be **GRANTED**.

## I. BACKGROUND

### A. Procedural History

On February 24, 2014, Plaintiff filed a Title II application for Social Security Disability Insurance, alleging on disability onset date of May 14, 2012. Administrative Record ("AR") 17. The Commissioner denied Plaintiff's claim initially on June 13, 2014 (AR 89-102, 119-123), and on reconsideration on December 19, 2014 (AR 103-118, 125-128). AR 17. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 7, 2017. AR 17. Plaintiff was represented by counsel at the hearing. *Id.* Plaintiff, her husband, and vocational expert Nelly Katsell testified at the hearing. AR 17.

On May 26, 2017, the ALJ issued a decision denying Plaintiff's request for benefits, finding that Plaintiff had not been under a disability within the meaning of the Social Security Act from May 14, 2012, through the date of the decision. AR 14-31. Plaintiff filed a Request for Reconsideration on July 19, 2017. AR 4. On October 11, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for judicial review purposes. AR 1-6. Plaintiff timely commenced this action in federal court.

### B. Plaintiff's Background and Testimony

Plaintiff was born on July 5, 1976. AR 29. Plaintiff lives with her husband and her son, who was 11 at the time of the hearing. AR 48-49.

Regarding education, Plaintiff is a high school graduate and also attended trade school at San Diego Job Core, where she acquired office skills. AR 44. She previously worked as a booking clerk and information assistant for the County of San Diego's Sheriff's Department from about 2010 to 2012, where she was in charge of data entry, mug shots, answering calls, and making reservations. AR 44-45, 50. The job also required her to work in the jail. AR 44. In that job, she testified that she would lift and carry about 10-20 lbs and was sitting most of the time. AR 45. She stated that she

stopped working because she was stressed, having panic attacks, depressed, and getting bad headaches. AR 45. She stated that a doctor did not tell her to stop working but she did receive state disability. AR 45. When pressed about what was stressful in the job, she testified that she was having a lot of problems with supervisors, managing work, and had psychiatric issues where she was on stress leave for about half the time she worked. AR 50. She clarified that it was the supervisors and other employees/coworkers that stressed her out, in particular supervisors who she felt attacked her. AR 50-51. During this time, she testified that she was taking medications but that they were not helping her. AR 51. Eventually, she was let go from the job. AR 53. She testified that she felt like she was doing well there, but let her go because of her personal issues, because she was sometimes tardy, and because she was absent a lot due to her stress and depression. AR 54. She testified that after she was let go, she did not look for another job and she did not need the money at the time because her husband was working. AR 54.

Plaintiff testified that she believes she is unable to work because she is always depressed, cries multiple times every day, finds it difficult to concentrate and focus, forgets things, has heightened anxiety around people, and finds it difficult to complete things in a certain timeframe and at a certain pace. AR 47. She testified to hearing voices and seeing shadows. AR 47. She testified that she has taken various medications. She was on Prozac for a while, but then it stopped helping. AR 56. She testified that the new medication she was on was not helping much either. AR 57. She testified that she has also had talk therapy over the years too but it was not helpful either. AR 57. When asked to rate her mental pain on a scale of 1 to 10, Plaintiff testified that she is usually a at a 6 or 7 on average over the last year. AR 66-67. When she goes to the grocery store with her husband, it goes up to an 8 to 9. AR 67.

Plaintiff describes her average day as starting off by taking her son to school, after which she comes home, gets in bed, and takes her meds. AR 48. She gets up to pick him up from school, then comes back home and gets back in bed. AR 48. She testified that she spends about 95% of her day in bed. AR 48. She testified that her husband does the

majority of the house cleaning and preparing the meals. AR 48. She also testified that she does not help her son with his homework. AR 49. When at home, she testified that she mainly lies in bed and just sleeps. AR 58. She does not watch TV but looks at the computer about 15-20 minutes a day. AR 58. She testified that she did not like going to the movies, family gatherings, restaurants, the beach, the zoo, or Seaworld. AR 58-59, 68.

As for physical symptoms, Plaintiff testified that she experiences pain daily in her back, knees, feet, ankles, hands, and neck. AR 45. She stated that the pain impedes her ability to kneel or sit down and get up fast and to walk long distances. AR 46. She also states that she has rheumatoid arthritis in her hands, for which she takes methotrexate and Tylenol arthritis. AR 46. She testified that she experienced this pain when she was last working for the County, and that medication helped but not entirely. AR 52-53. She testified that she can ride in the car for about 30 minutes before experiencing back pain, stand for about 30 minutes before experience back and knee pain, walk for about 15 minutes before having to stop, lift and carry only about five lbs. AR 62-63. Plaintiff testified that she would regularly be in pain at a 4 or 5 on a scale of 1 to 10, where it would be less when she was laying in bed. AR 64-65. She testified that she could only work if her pain was at a 1 or 2. AR 66.

### C. Plaintiff's Husband's Testimony

Daryl Gardener, Plaintiff's husband, also provided testimony at her hearing. AR 70. They have been together for fifteen years, and married for two. AR 71. He testified that Plaintiff had difficulty with concentration, where he often have to remind her to pick up their son or to bathe. AR 71, 72. He testified that sometimes she gets just stuck in the car and is unable to move. AR 73-74. He also testified that she often has panic attacks, where she needs to call him to help calm her down. AR 71-72. In addition, he testified that she has trouble interacting with others, where she will get upset and end up in a confrontation. AR 72. He testified that she does not do well in groups of more than 5 or 6 people. AR 72. He testified that she spent about 95% of her time in bed. AR 75. He

3:18cv2407-WQH-NLS

knew her when she had her job with the County and said that she could not cope with the employees and supervisors, and would often call him from the bathroom to cry. AR 75. He testified that his opinion was that she could not work full-time because of her mental capacity, where she is required to be around any other person, because her attention span is limited to 10 minutes, she cannot concentrate, and gets frustrated and anxious. AR 80. He also testified that she does not do housework and when she does, she often needs help, such as taking laundry to the laundromat. AR 77-78. He testified that he has never heard her talk about suicide. AR 80. He also testified that her mental issues have gotten worse over the years. AR 81.

### D. Documentary Medical Evidence

Plaintiff's medical records include treatment for physical ailments but the Court will limit the overview here to her mental health treatment as Plaintiff does not challenge the ALJ's treatment of the physical impairments in this case. *See* ECF No. 14-1 at 7.

### i. Treatment in 2011-2012

The earliest mention of depression in Plaintiff's medical records before the Court was on February 14, 2011, where she was seen at Kaiser Permanente on an unrelated physical issue. AR 873. Treatment notes stated that she has a history of depression, was previously on Prozac, but she stopped taking it. It was noted that it was "presently controlled per the patient" and that she did not want medication at that time.

Subsequently, on March 23, 2011, Plaintiff screened positive for depression at a Vista Mobile Health Van event. AR 914. She requested prescriptions for Prozac and Ambien via email. AR 922. She wrote that her anxiety and depression were getting worse and she was having problems sleeping and focusing. *Id.* She reported feeling drained and not wanting to be around people, crying a lot, and feeling very agitated. *Id.* She was prescribed Prozac after speaking to a Kaiser nurse on the phone and told to follow up. AR 928.

On May 10, 2011, she was seen by Dr. Nguyen Phuong Tran, who noted that Plaintiff complained her anxiety and depression were getting worse and that she had a

"supervisor at work that [was] causing most of her stress." AR 948. She reported having problems sleeping, but no suicidal thought or plan. *Id.* She was noted to be alert, oriented to person, place and time, and in no distress. *Id.* She was given 2 weeks off work. AR 949.

Dr. Tran saw Plaintiff again on June 6, 2011, where she reported slight improvement with Prozac. AR 980. He noted that "patient has anxiety d[ue] to work environment and relationship with her supervisor. *Id.* He increased her Prozac dosage. AR 981.

On October 17, 2011, she was seen in the Psychiatry department by Laura Daniels, MFT. AR 1119. The chief complaint was listed as "depression: work and family related." AR 1128. Onset was noted to be 1996, but that it was recurrent and worsening for the last five months. *Id.* Specifically, as to the recent onset, treatment notes stated that it was "specific to work related stressors," and Plaintiff had stated that "she feels singled out a lot by her supervisor, with reprimands for small things other employees are not reprimanded for." *Id.* Plaintiff also reported that she was currently looking for another job within the county and had not taken any action with her employer otherwise regarding her situation. *Id.* Dr. Daniels assessed her with severe depression. AR 1129. Suicidal ideation was present but mild, and Plaintiff did not report any suicidal plan or intent. *Id.* She was noted to have good attire, grooming, and hygiene, but poor eye contact and negativistic behavior. AR 1131. Mood was anxious and depressed with a congruent affect. Her thought process was coherent and relevant and she was oriented to person, place, time, situation, with memory intact to immediate, recent, and remote recall, and alert and clear. *Id.* Her judgment and impulse were unimpaired and insight and reliability average. *Id.* Dr. Daniels provided a treatment plan with short term goals and noted that that Plaintiff was motivated to comply. AR 1132.

On November 2, 2011, a disability evaluation was performed by Susan Stewart, LCSW. AR 1222. It was noted that Plaintiff suffers from major depressive disorder, dysthymia, moderate bipolar disorder. AR 1222. Her GAF score was assessed to be 60-

51, with moderate symptoms and moderate difficulty in social and occupational functioning. AR 1222. She was assessed with significant impairment in the following: daily responsibilities, sleeping, communication, participation in activities, management of conflicts, memory, decision-making, irritability, anxiety, and depression. AR 1223. She was assessed with moderate difficulties in eating, hygiene, concentration, and organization and mild difficulties in thoughts of harming self. AR 1223. She was assessed with no difficulties in following through with assignments and thoughts of harming others. AR 1223. The assessment also discussed her work issues with her feeling that her supervisor was picking on her and singling her out with constant criticism and attempting to force her to quit. AR 1223. Plaintiff reported that she was looking for other positions in the county. AR 1223.

Plaintiff's next appointment was November 15, 2011 with Dr. Scott Richards, who performed a psychiatric initial screening assessment. AR 1261. He reported Plaintiff presenting as alert and oriented with no focal deficits, appropriate eye contact, well-kempt, normal speech but slow psychomotor movements, depressed mood, and intact memory, judgment, and linear thoughts. AR 1264. She denied any suicidal or homicidal ideation. *Id.*

Plaintiff continued with more regular visits through early 2012. She was seen on December 2, 2011 by psychiatric social worker Bharanthy Thridandam. AR 1318. Plaintiff complained about sleep issues and reported being "depressed all the time" and suffering from crying spells. *Id.* At the time of the appointment, Plaintiff had been given time off work from October 17, 2011 though December 15, 2011. *Id.* She was seen again a week later on December 8, 2011, where she stated that the therapy was helping but she still did not feel like she could go back to work. AR 1343. On December 15, 2011, she reported getting more irritable and snappier, and still being depressed all the time. AR 1367. She did report starting to play in the backyard with her son, decluttering and organizing the house, and getting out of bed to do things and keep moving. *Id.*

On December 19, 2011, she started to see therapist Lynn Gary. AR 1379. She was

reported as being still very depressed. AR 1379. The treatment notes stated that "[s]tress and unfairness by her supervisor has led her to fear losing her job." *Id.* She discussed her family situation and history and how she did not have much support. *Id.* Impairment was noted to be great and symptoms to be severe. AR 1380. She denied any suicidal or homicidal ideation or plan, primarily because of her son. *Id.* She was noted to be compliant with her treatment plan most of the time. AR 1379. She was put off work through January 10, 2012. AR 1395. She saw Lynn Gary again on January 12, 2012, where she was noted to be "somewhat better, in that she made direct eye contact and smiled" upon greeting. AR 1423. She also reported that she did several activities with her son. AR 1424. She was given another week off work and stated that she still experienced high anxiety about returning to work. *Id.* She continues to have crying spells and not wanting to get out of bed. *Id.* She was seen again on February 13, 2012, where she reported feeling a lot better but still not at a level where she felt she could return to work. AR 1524. She reported being somewhat fragile but making an effort to engage with her son. *Id.* She was noted to have good progress toward the goals of the treatment plan, and her overall impairment and severity of symptoms were now moderate. *Id.* Dr. Gray had a conversation with Plaintiff on February 23, 2012 to discuss needing to develop a plan to go back to work and educated Plaintiff about the fear of returning to work when it had been too long. AR 1560. She saw Plaintiff again on February 27, 2012, where she noted that Plaintiff was doing much better, but still depressed and worries about returning to work. AR 1567. She was noted to have some dissociative moments and was still somewhat fragile. *Id.* She was noted also to still be very nervous about how her coworkers and supervisor would treat her upon return to work. *Id.* That was the last appointment with Dr. Gray in Plaintiff's records before a hiatus in treatment.

During the time she saw Dr. Gray, she also met several times with a psychiatrist, Dr. Etta Lindenfeld. The first visit was on January 17, 2012, where she presented as neat, clean, but with poor eye contact, and body tremors when she spoke of traumas. AR 1467.

She was noted to be extremely sad and cried intermittently. *Id.* She had passive suicidal ideation, with paranoid symptoms, but not auditory or visual hallucinations. AR 1468. She presented as oriented, with memory and judgment intact. *Id.* She was assessed to not meet the criteria for inpatient psychiatric care. *Id.* Dr. Lindenfeld adjusted Plaintiff's medications. *Id.* She saw Dr. Lindenfeld again on January 24, 2012 but had not been able to buy her medications due to money so was given more time to try her new medications. AR 1504. She saw Dr. Lindenfeld once more on March 5, 2012, where she reported some adverse effects and symptoms from her medications. AR 1577. She was noted to exhibit anxious anticipation of returning to work and that she had applied for other positions. AR 1577. Dr. Lindenfeld adjusted Plaintiff's medications again based on her complaints. AR 1578.

### ii. Treatment after 2014

Plaintiff medical records do not show any mental health treatment after early 2012 until early 2014. On February 18, 2014, she restarted treatment with Dr. Lindenfeld and explained that she lost her mental health insurance coverage when she lost her job but recently obtained coverage again through her then boyfriend (now husband). AR 2251. During the visit, she was noted to be not working, which was "emotionally better for her." *Id.* She reported still not being well, crying, isolated, fearful of people and being angry in public situations, and experiencing auditory hallucinations where she heard her name being called. *Id.* She was noted to be neat and clean, but with poor eye contact. *Id.* Her mood was extremely sad, and had a congruent affect where she was blunted and withdrawn. *Id.* She was oriented and had intact memory and judgment. *Id.* Dr. Lindenfeld adjusted Plaintiff's medications after the visit. AR 2252.

Thereafter, Plaintiff began more regular appointments with Dr. Lindenfeld. On April 18, 2014, Plaintiff reported hearing auditory hallucinations telling her she was fat and undeserving, particularly when she was alone at home. AR 2290. She reported being unable to go to the store with her fiancé unless she took Ativan. *Id.* Her mood was noted to be somewhat better on Celexa. *Id.* Her mental status exam was the same as

noted on her previous visit.  *Id.*  Dr. Lindenfeld adjusted Plaintiff's medications due to issues with a weight gain side effect.  *Id.*  On June 23, 2014, Plaintiff was noted to be feeling very low and worthless, being unable to get out of bed, and experiencing passive suicidal ideation.  AR 2319.  She had stopped taking Risperdal due to weight gain and feeling more depressed.  *Id.*  She reported feeling withdrawn, isolated, irritable, unmotivated, and guilty.  *Id.*  She saw her family socially about once a month.  *Id.*  Her paranoia remained, where she reported feeling like someone was following her even though she knew it was not true.  *Id.*  Dr. Lindenfeld again adjusted her medication, to have her taper off Celexa and start Effexor for her depression and start Abilify for her paranoia.  AR 2320.  Plaintiff missed a series of her next appointments (AR 2333, 2592, 2597, 2603, 2624), and saw Dr. Lindenfeld again on October 17, 2014.  At that appointment, she continued to complain about high irritability, anger, and throwing things and hitting the wall.  AR 2466.  She reported experiencing auditory hallucinations of a command nature to crash her car or overdose on pills but will not because of her son. *Id.*  She reported still being isolated and not wanting to go out.  She reported taking less Effexor than prescribed because it made her feel angry and never took Abilify because of fears it would make her worse.  *Id.*  She reported feeling stress over her upcoming wedding and often argued with her fiancé.  *Id.*  Dr. Lindenfeld again adjusted her medications.  AR 2467.

On December 9, 2014, Plaintiff began to see Dr. Yona Choung.  AR 2528. Plaintiff reported still feeling depressed, experiencing sadness and crying, feeling worthless, and not wanting to be touched.  *Id.*  She reported feeling a decrease in her energy level and motivation, wanting to stay in bed, paranoia about others staring at and following her, and auditory and visual hallucinations.  *Id.*  She was noted to be noncompliant with her medications because she sometimes felt scared to take them due to secondary side effects.  *Id.*  Her mental health exam revealed that she maintained appropriate eye contact, normal gait, posture, behavior and motor activity, down mood and affect, normal speech, coherent and logical thought, alert and oriented to person,

place and situation, and fair insight and judgment.  AR 2529.  She was put on Prozac, Seroquel, and Ativan.  AR 2530-31.  After a couple of more cancelled appointments (AR 2540, 2250), she also began to see therapist Donna Gray on January 21, 2015. Treatments notes stated that she was very withdrawn, extremely soft spoken, did not have normal eye contact, and was very tense during the session.  AR 2556.  She stated that she did not feel like she could work, and was fired from her County job, which she felt was "too stressful." *Id.*  She spends almost all of her time at home, and sometimes thinks that people are watching or talking about her, but reported that she can usually talk herself out of feeling threatened.  *Id.*  Her overall impairment was noted to be great and severity of symptoms to be severe.  *Id.*  On February 20, 2015, Plaintiff saw Dr. Choung again.  She reported being unsure if the Prozac was helping.  AR 2564.  She reported flashbacks to previous abuse, more vivid nightmares, continued paranoia when outside of someone following her, continued sadness and crying, and feeling worthless.  *Id.*  Her mental health status was similar to her previous visit.  AR 2566.  Dr. Choung adjusted her medications slightly.  AR 2567.  She saw Drs. Choung and Gray a couple of more times, with the latest appointment on March 30, 2015.  AR 2576, 2581, 2586.

In 2016, Plaintiff began to see Dr. Melanie Leadley.  AR 2669.  On March 1, 2016, treatment notes indicated that her previous medications were not working and Plaintiff continued to feel depressed, more emotional, with lower thoughts.  AR 2673.  She was reported to not be experiencing any auditory or visual hallucinations or paranoia.  *Id.*  She reported feeling more agitated and more sensitive, with lower energy.  *Id.*  Her mental status exam reported her as well groomed, in no acute distress, and cooperative.  AR 2676.  She had fair rapport with intermittent eye contact, regular and normal speech, flat affect congruent with mood, linear, logical and goal oriented thought process, passive suicidal ideation without plan or intent, good judgment, fair insight, and low impulsivity. AR 2676-77.  Dr. Leadley noted that her symptoms did not warrant a high level of care and outpatient care was still appropriate.  AR 2677.  Dr. Leadley told Plaintiff to stop her previous medication Latuda and start Geodon.  *Id.*  Plaintiff saw Dr. Leadley again on

April 7, 2016 and May 20, 2016, but no treatment notes appeared in the record.  AR 2683, 2688.  At her June 21, 2016 appointment, Plaintiff reported that she stopped taking Geodon weeks ago.  AR 2694.  She reported still feeling paranoid and needing to take Lorazepam in order to leave the house.  *Id.*  She also reported hearing someone call her name and seeing shadows.  *Id.*  She also reported feeling on edge and anxious all the time, and felt that nothing helps her symptoms.  *Id.*  Her mental health exam was mostly same as previous visit, but mood was noted to be dysthymic.  AR 2696-97.  Dr. Leadley adjusted Plaintiff's medications again, and noted that her symptoms seemed more consistent with PTSD and not a separate psychotic process.  AR 2697-98.  Plaintiff saw Dr. Leadley again on August 2, 2016, where she reported no real difference with new drugs apart from sleeping better.  AR 2711.  She reported being more irritable and emotional and tearful.  *Id.*  She still expressed concerns about people following her and did not go out much, but could if she had to.  *Id.*  Her mental health exam was again similar, but without suicidal ideation.  AR 2714.  The last treatment notes in Plaintiff's record with Dr. Leadley was on January 17, 2017, where she reported feeling "really down."  AR 2734.  She reported experiencing panic attacks at night and waking up sobbing.  *Id.*  She was noted to be rarely taking the prescribed lorazepam.  *Id.*  She experienced a recent flare-up of her rheumatoid arthritis, which had affected her mood.  *Id.*  She did not report any psychotic symptoms at that appointment.  *Id.*  Her mental status exam reported her being in no acute distress, cooperative, mild psychomotor retardation, good rapport, intermittent eye contact, regular and normal speech, largely flat mood but tearful at end of appointment, linear, logical and goal oriented thought process, good judgment, fair insight, and low impulsivity.  AR 2737.  Dr. Leadley again adjusted her medications.  AR 2738.

### iii.    Camellia Clark

On May 27, 2014, Plaintiff was evaluated by Dr. Clark for the Department of Social Services, Disability Evaluation division.  AR 463.  Plaintiff arrived at the appointment on time and drove herself.  AR 463.  During her examination, she was

observed to be adequately dressed and groomed. AR 464. She appeared able to take care of herself and all chores necessary to live independently and take care of her son. AR 464. She reported not handling her own money though. AR 464. Her posture, gait and psychomotor activity were normal, and her speech was normal but slow. AR 464. She exhibited detached and flat mannerisms and maintained poor eye contract. AR 464. She was oriented to month, date, and year but not the city she was in. AR 464. She was able to spell her name backwards but was not able to complete a test where she was asked to count down by threes. AR 464. She was able to recall details from her history and recall two out of three items after five minutes, and maintained concentration during her examination. AR 464. He judgment and insight were observed to be intact. AR 464. Her affect was observed to be completely flat. AR 464. She reported suicidal ideation in the past, but nothing in the present. AR 464. Though she reported hallucinations in the past, she was observed to be logical and goal oriented in the evaluation. AR 464.

Dr. Clark found no limitations in the following areas: (1) ability to sustain an ordinary routine without sustained supervision; (2) ability to complete simple tasks; and (3) ability to avoid normal hazards. AR 465. She found moderate limitations in the following areas: (1) ability to socially interact with others; and (2) able to understand instructions. AR 465. Finally, Dr. Clark found marked limitations in the following areas: (1) ability to complete detailed tasks; (2) ability to complete complex tasks; and (3) ability to concentrate for at least two-hour increments at a time, in order to maintain a regular work schedule. AR 465.

### iv.    Gregory Nicholson

On November 25, 2014, Plaintiff was also evaluated by another psychiatrist, Greg Nicholson. AR 533. Plaintiff arrived on time and was driven by her son's father. AR 533. During the evaluation, she reported hearing auditory hallucinations, calling her name or telling her to harm herself. AR 534. She also reported paranoia, irritability, depressed mood, insomnia, decreased appetite and energy, trouble concentrating, and decreased interested in activities. AR 534. She reported that she stopped working at her

3:18cv2407-WQH-NLS

detention center job because of stress.  AR 535.  As for daily activities, she reported that she does not cook meals, does not do laundry, and does not drive because of "road rage."  AR 535.  However, she can dress herself, bath, and maintain hygiene.  AR 535.  She also reported being able to handle bills and cash, and go out on her own.  AR 535.

During the examination, Dr. Nicholson reported that Plaintiff was neatly groomed and made good eye and interpersonal contact with him.  AR 535.  He found her cooperative and genuine during the interview.  AR 535.  Her thought process was coherent and organized, and was able to follow the conversation.  AR 535.  She confirmed experiencing hallucinations and paranoia, but did not experience any during the interview.  AR 536.  Her mood was noted to be depressed and affect dysphoric.  AR 536.  Plaintiff's speech was normal and articulated, she was alert and oriented to time, place, person and purpose, and appeared of normal intelligence.  AR 536.  She was able to complete a test where she was asked to count down by threes, and could do a simple math problem.  AR 536.

Dr. Nicholson diagnosed Plaintiff with psychotic disorder, anxiety disorder, and depressive disorder and assigned her a GAF of 50.  AR 537.  For prognosis, he stated that he expected that her condition would improve in the next twelve months with treatment.  AR 537.  He concluded that she is able to understand, remember, and carry out simple one or two step instructions and is able to follow detailed and complex instructions.  AR 538.  He found mild limitations at all the following areas: (1) Plaintiff's ability to relate and interact with coworkers and the public; (2) her ability to maintain concentration and attention, persistence, and pace; (3) her ability to accept instructions from supervisors; (4) her ability to maintain a regular attendance in the workplace and perform work activities on a consistent basis; and (5) her ability to perform work activities without special or additional supervision.  AR 538.  He also concluded that she can handle funds.  AR 538.

### E. Vocational Expert's Testimony

Vocational Expert ("VE") Nellie Katzel testified at the hearing.  AR 81.  She characterized Plaintiff's vocational background as a prisoner-classification interviewer,

with a Specific Vocational Preparation ("SVP") of 7 and listed as sedentary position. AR 82. Plaintiff stated that she did not to have a degree or criminal justice course to qualify for that job, but received on the job training. AR 82.

The ALJ posed this first hypothetical to the VE, asking whether there would be any jobs that could fit the following restrictions: sedentary; unskilled, meaning low production-level job, no working with general public or crowds of coworkers, occasional verbal contact with supervisors and coworkers, and ability to deal with only occasional changes in a routine work setting; low concentration, meaning alert and attentive but only to unskilled routine work tasks; low memory, meaning requiring only the ability to understand, remember, and carry out simple work instructions and ability to remember and use good judgment in only making simple work related directions; lift 10 pounds occasionally; list and carry only 5 pounds occasionally; standing for 15 minutes or walking for 15 minutes, for total of 2 hours in a 8-hour work day; sit 30 minutes for total of 6 hours where she would sit for 30 minutes, then stand briefly and repeat the pattern; no more than occasional stooping, bending, twisting, or squatting; no work on floor, including no kneeling, crawling, and crouching; no climbing or descending a full flight of stairs; no over lifting or reach with either extremity; no more than frequent reaching, handling, and fingering. AR 82-84. Against this hypothetical, the VE testified that there would be three jobs that would fit the requirements: (1) addresser, 209.587-010, with national number of 175,000; (2) polisher of eyeglass frames, 713.684-038, with national number of 120,000; and (3) cutter and paster, 249.587-014, with national number of 235,000. AR 84. The VE testified that these numbers were eroded in light of the sit/stand option. AR 85.

The ALJ presented the VE with another hypothetical, adding in the additional constraint that, instead of occasional verbal contact with supervisors and coworkers, it would be rare contact. AR 85. The VE testified that she would not be able to perform these three jobs with this additional limitation, and that she would not be employable. AR 85. As to these three jobs, the ALJ also asked whether below average performance to

15-20% below average and excessive absenteeism to 3 or 4 full days a month would preclude employment, and the VE said that it would. AR 87. The ALJ then asked the VE whether she might be able to work as a caretaker of a property or house-sitter while someone is gone. AR 86. The VE testified that house-sitter would be a possibility. AR 86.

## II.    THE ALJ DECISION

### A.    The Sequential Process

To qualify for disability benefits under the Social Security Act, an applicant must show that he or she cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least twelve months. 42 U.S.C. §§ 423(d), 1382c(a)(3). The Social Security regulations establish a five-step sequential evaluation to determine whether an applicant is disabled under this standard. 20 C.F.R. §§ 404.1520(a), 416.920(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

At step one, the ALJ determines whether the applicant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(b). If not, then at step two the ALJ must determine whether the applicant suffers from a severe impairment or a combination of impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(c). If the impairment is severe, at step three the ALJ must determine whether the applicant's impairment or combination of impairments meets or equals an impairment contained under 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* §§ 404.1520(a)(4)(iii), 416.920(d). If the applicant's impairment meets or equals a listing, he or she must be found disabled. *Id.*

If the impairment does not meet or equal a listing, the ALJ must determine the applicant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(e). Then, the ALJ must determine at step four whether the applicant retains the residual functional capacity to perform past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(f). If the applicant cannot perform past relevant work, at step five the ALJ must consider whether the applicant can perform any other work that exists in the national

economy.  *Id.* §§ 404.1520(a)(4)(v), 416.920(g).

The applicant carries the burden to prove eligibility from steps one through four but the burden at step five is on the agency.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  Applicants not disqualified at step five are eligible for disability benefits.  *Id.*

### B.    Substance of the ALJ's Decision

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since May 12, 2012, the alleged onset date.  AR 19.

At step two, the ALJ determined Plaintiff's major depressive disorder, anxiety, post-traumatic stress disorder, and chronic lumbar and cervical spine sprain/strain constituted severe impairments.  *Id.*  In addition, the ALJ determined that Plaintiff's rheumatoid arthritis was not a medically determinable impairment.  *Id.*

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that would meet or medically equal the severity of any listed impairments.  AR 20-21.  The ALJ did not find Plaintiff's physical impairments exhibited the requisite nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, nor did Plaintiff's back disorder result in the inability to ambulate.  AR 20.  As to Plaintiff's mental impairments, the ALJ considered Paragraph B criteria and found that Plaintiff did not exhibit the requisite one extreme or two marked limitations.  AR 20.  Specifically, the ALJ found only: mild limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; marked limitation in concentrating, persisting, or maintaining pace; mild limitation in adapting or managing herself.  AR 20-21.  In addition, the ALJ considered Paragraph C criteria and found that Plaintiff did not have only marginal adjustment.  AR 21.

The ALJ next established that Plaintiff retained the residual functional capacity to perform the full range of unskilled sedentary work as defined in 20 C.F.R. § 404.1567(a), except that such work could not require:

- Lifting more than 10 pounds at a time on more than occasional basis;
- Lifting and carrying articles weighing more than 5 pounds, on more than

occasional basis;

- Standing or walking more than 15 minutes at one time and no more than 2 total hours in an 8-hour workday;
- Sitting more than 30 minutes at a time, and no more than 6 total hours in an 8-hour work day;
- More than occasional stooping, bending, twisting, or squatting;
- Working on the floor;
- Ascending or descending full flights of stairs;
- Overhead lifting or overhead reaching with either extremity;
- More than frequent reaching, handling, fingering;
- Working in other than low stress environment – low production level, not working with general public or crowds of coworkers, only "occasional" verbal contact with supervisors and coworkers;
- Working at no more than a low concentration level, which means the ability to be alert and attentive to only routine unskilled work tasks;
- Working at no more than a low memory level – ability to understand, remember, and carry out only "simple" instructions and ability to remember and use good judgment in making only "simple" work decisions.

AR 22.

With these limitations, at step four, the ALJ determined Plaintiff could not perform any of her past relevant work. AR 29. However, the ALJ found that Plaintiff was only 35 years old and considered a younger individual and has at least a high school education and the ability to communicate in English. *Id.* Thus, the ALJ found that given her background, there were significant jobs in the economy that she could perform, including several specifically enumerated by the vocational expert. *Id.* The ALJ concluded Plaintiff was not under a disability as defined in the Social Security Act from May 14, 2012, the alleged disability onset date, through May 26, 2017, the date of the decision. AR 30-31.

## III. Legal Standard of Review

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. § 405(g). A reviewing court must affirm the denial of benefits if the agency's decision is supported by substantial evidence and applies the correct legal standards. *Batson*, 359 F.3d at 1193. "Substantial evidence

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and citation omitted). It is a "highly deferential" standard of review. *Valentine v. Astrue*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Vasquez v. Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted). If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld. *Molina*, 674 F.3d at 1111. It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff. *Batson*, 359 F.3d at 1193.

## IV. DISCUSSION

On the face of Plaintiff's motion, she states that she is making two separate arguments: (1) that the ALJ's opinion is not entitled to the deference of the substantial evidence test; and (2) that the ALJ committed an error of law by failing to properly consider the evidence of record. ECF No. 14-1 at 10. While Plaintiff attempts to present her argument as two separate inquiries, it appears those arguments essentially conflate into one—whether the ALJ committed some error of law in evaluating the medical opinions. *See also* ECF No. 21 at 2. Plaintiff appears to argue that if the ALJ did commit legal error, then the opinion cannot be afforded the deference of the substantial evidence test. Therefore, the Court will first address whether the ALJ committed any legal error with regard to treatment of the medical opinions of record.

In the ALJ's opinion, he first reviewed the testimony provided by Plaintiff and her husband. AR 23-24. Then, after concluding that Plaintiff's medically determinable impairments could reasonably have expected to produce her symptoms, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence

in the record" and that Plaintiff was not "as limited as she alleges."[1]  AR 24.

After setting out this ultimate conclusion, the ALJ spends the next pages of the decision summarizing the medical evidence of record.  He discusses her mental health treatment records.  AR 24-25.  Plaintiff does not appear to object to any of this discussion specifically.

The ALJ then discusses the consultative medical examinations conducted by Drs. Clark and Nicholson.  Plaintiff objects to the ALJ's discussion of Dr. Clark, specifically her finding that Plaintiff had a "marked" limitation in her ability to concentrate for at least two-hour increments at a time, in order to maintain a regular work schedule.  ECF No. 14-1 at 14-15.  The ALJ found that this opinion by Dr. Clark was not be supported and specifically, inconsistent with her other determinations that Plaintiff was able to spell her name forward and backward, she was not easily distracted, her judgment and insight were intact, and her thought process was logical and goal oriented.  AR 26.  Plaintiff argues that this is a "cherry picked" assessment of Dr. Clark's opinion and that it is inconsistent that the ALJ's own finding under Paragraph B criteria that Plaintiff had a "marked" limitation in concentrating, persisting, or maintaining pace.  ECF No. 14-1 at 15; AR 20-21.

The Court does not find that the ALJ committed any legal error in rejecting this one finding by Dr. Clark.  Plaintiff's argument does not identify any statute or legal rule that the ALJ wrongly applied or violated—rather, the argument is more akin to a simple disagreement with the ALJ's conclusion.  Here, the ALJ gave specific reasons for why he rejected this one opinion—because it was not consistent with Dr. Clark's other observations, particularly that Plaintiff was not easily distracted, had intact judgment and insight, and logical and goal oriented thought process.  AR 26.  These observations are

---

[1] In her opening brief, Plaintiff objects to this statement as "internally contradictory given the extreme findings that [the ALJ] made regarding plaintiff's exertional and nonexertional limitations."  ECF No. 14-1 at 13-14.  The Court disagrees that this statement is "internally contradictory" simply because the ALJ did assess Plaintiff with some severe limitations in his RFC determination.  The ALJ could still have reasonably assessed Plaintiff with severe limitations without accepting all her testimony.

rationally related to Plaintiff's ability to concentrate and the Court cannot conclude that the ALJ's conclusion was unreasonable. The Court must uphold the ALJ's decision, even if the evidence is susceptible to more than one reasonable interpretation. *Molina*, 674 F.3d at 1111.

Furthermore, Plaintiff does not explain why the ALJ's rejection of this finding necessary conflicts with the ALJ's other conclusion under Paragraph B criteria that Plaintiff had a "marked" limitation in concentrating, persisting, or maintaining pace. The regulation explains that:

> This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. These examples illustrate the nature of this area of mental functioning.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00E.3.[2] The same regulations define "marked" as when "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id.*, 12.00F.2.d. As there is no specific reference to any time period, the ALJ could plausibly find a "marked" limitation under this Paragraph B criteria and still find that Plaintiff could concentrate for two hours at a time. The ALJ did include several limitations on concentration, persistence, and pace in his final RFC, including, that Plaintiff could only work "at no more than a low concentration level, which means the ability to be alert and attentive to only routine unskilled work tasks" and

---

[2] This citation is to the Mental Health Impairment Listings as it existed on May 26, 2017, the date of the ALJ's decision. These rules were modified effective January 17, 2017 and specified that "[w]hen the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date." Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01.

could only work "at no more than a low memory level – ability to understand, remember, and carry out only 'simple' instructions and ability to remember and use good judgment in making only 'simple' work decisions." AR 22.

Plaintiff seems to suggest in her brief that had the ALJ accepted Dr. Clark's finding of the "marked" limitation on her ability to concentrate for two-hour increments at a time, that the ALJ "must find plaintiff to be disabled." ECF No. 14-1 at 14. However, Plaintiff fails to explain why this must be so. In a footnote, Plaintiff states that "'marked' is the severity required to 'meet the listing,'" without any citation. *Id.* at 14 n.4. If this is why Plaintiff believes the ALJ must find Plaintiff disabled had he adapted the two hour concentration finding by Dr. Clark, it appears unfounded. The "meet the listing" language suggests that Plaintiff might be referring to Paragraph B criteria. However, in order to meet Paragraph B, a claimant must be found to have "marked" limitations in two areas, not one. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A.2.b ("To satisfy the paragraph B criteria, your mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."). Moreover, the ALJ did already find that Plaintiff had "marked" limitation in the area of concentrating, persisting, or maintaining pace. The issue was that he did not find a marked or extreme limitation in the other areas.[3] Thus, it is unclear how adapting Dr. Clark's opinion as to this one finding related to concentration would have forced the ALJ to find Plaintiff disabled.

Plaintiff additionally argues that the ALJ gave no reason to disregard opinions of her treating physicians that consistently documented that she is unable to work. ECF No. 14-1 at 15. Without Plaintiff providing citation to support this argument, the Court assumes that she is referring to her providers at Kaiser Permanente that put her on off-work status towards the end of 2011 and beginning of 2012. *See supra* Section D.i. As Defendant correctly points out, the determination about whether a claimant is "unable to

---

[3] The other areas are: (1) understanding, remembering, or applying information; (2) interacting with others; and (3) adapting or managing oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00E.1-3.

work" is the ultimate decision of the ALJ and "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the ALJ] will determine that [the claimant is] disabled." 20 C.F.R. § 404.1527(d)(1). Moreover, there was sufficient evidence in the record for the ALJ to reject these determinations by the medical sources. During the course of treatment, it was clear that the unable to work status was temporary. The treatment notes continually indicated that the reason for Plaintiff's stress and anxiety and being off work was due to issues with her supervisor and coworkers. *See* AR 980 (noting work environment and relationship with supervisor); AR 1128 (noting that Plaintiff felt singled out by supervisor and reprimanded); AR 1222 (noting being picked on by supervisor, constant criticism, belief they are trying to get her to quit); AR 1263 (noting work conflict); AR 1379 (noting stress and unfairness at job). Plaintiff noted during this period of treatment that she was looking for other work. *See* AR 1128 (noting Plaintiff stated that she was currently looking for another job within the county); AR 1222 (noting same). Part of Plaintiff's treatment plan included attending Back to Work classes, which Plaintiff completed. *See* AR 1132; 1381; 1424 . Plaintiff and her therapist also proactively discussed how to get her on track to go back to work. *See* AR 1560; 1567 (discussing medications that may help Plaintiff transition back to work). Thus, it would be reasonable for the ALJ to understand the off work restriction as limited to Plaintiff's position at that time, without taking into account any RFC limitations like the ALJ is obligated to under the framework.

In her reply, Plaintiff additionally argues that the two hour limitation found by Dr. Clark is also supported by her daily activities and that the ALJ should not have discounted her testimony. ECF No. 21 at 5. For example, Plaintiff points to testimony by Plaintiff and her husband that in her typical day, Plaintiff gets up only to take and pick up her son from school but otherwise spends the rest of her time, estimated 95%, in bed. *Id.* Plaintiff additionally testified that she had trouble completing tasks at a certain time, focusing on specific things, concentrating, and feeling pressured to perform at a certain pace. *See* AR 47. A claimant's subjective symptoms are a proper consideration in a

3:18cv2407-WQH-NLS

disability evaluation, but those statements alone cannot be decisive on a disability claim. 20 C.F.R. § 404.1529(a); *Smolen v. Chater*, 80 F.3d 1273, 1291 (9th Cir. 1996). In deciding whether to credit a claimant's testimony about subjective symptoms or limitations, an ALJ must engage in a two-step analysis. *Smolen*, 80 F.3d at 1281. Under the first step, the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce pain or other symptoms. *Smolen*, 80 F.3d at 1281. If this step is satisfied, and there is no affirmative evidence that the claimant is malingering, then the ALJ must determine the credibility of the claimant's subjective complaints and "evaluate the intensity and persistence of [the] symptoms" to determine whether and how these symptoms limit a claimant's ability to work. *See* 20 C.F.R. § 404.1529(c)(1). The ALJ may reject the claimant's testimony about the severity of symptoms as long as he gives clear, specific, and convincing reasons for doing so. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007); *Batson*, 395 F.3d at 1195. In weighing a claimant's credibility, the ALJ may consider the following factors: 1) reputation for being honest; 2) inconsistencies in the claimant's testimony; 3) inconsistencies in the claimant's conduct; 4) daily living activities; 5) work record; and 6) physician's testimony concerning the symptoms alleged. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (quoting *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). Here, the ALJ found that Plaintiff's limitations were not as severe as she alleged at step two, and spends several paragraphs reviewing her medical record to explain why. AR 24-27. In her review of the medical record, the ALJ pointed to observations by Plaintiff's treating physicians about her depression and anxiety, her treatment, and her progress. AR 24-25. During these sessions, Plaintiff did often report crying, feeling low and unmotivated, but was often observed to have normal speech, normal thought process, and normal speech. Indeed, even Dr. Clark, whose opinion Plaintiff appears to argue the ALJ should have adopted in whole, noted that Plaintiff was capable of many daily activities, including caring for her personal hygiene, live independently, drive occasionally, and care for her child. AR 26. Further consultative

examinations reported similar findings. AR 26-27. All these records support the ALJ's determination that Plaintiff's subjective complaints about what she was capable of handling on a day to day basis were not as severe as she alleged. Further, while Plaintiff did testify about her problems concentrating, she testified as such generally without any specific reference to how long she felt she could concentrate for and the ALJ's RFC reflects several limitations addressing concentration issues already, including limiting her to low stress, low concentration levels, unskilled work, low memory tasks, and simple instructions and decisions. AR 22.

Also in her brief, Plaintiff discusses the hypotheticals presented to the VE by the ALJ. ECF No. 14-1 at 16. In particular, noting that if the hypothetical RFC was modified to include either of the following additional restrictions, Plaintiff would be found to be unable to work: (1) modified contact with supervisors and coworkers from "occasional" to "rare;" and (2) well below average performance (15-20% below average) and excessive absenteeism (3 to 4 8-hour shifts each month). *Id.* Plaintiff then states that "[s]uch findings would be consistent" with Plaintiff and her husband's testimony and the medical evidence of record. *Id.* To the extent that Plaintiff is arguing that the ALJ should have included either or both of these additional restrictions in his RFC, the Court finds that the ALJ's decision not to do so was reasonable and well supported. The ALJ makes clear in his order that he believed Plaintiff stopped working primarily because of her work environment, namely her adverse interactions with her supervisor and coworkers, rather than her actual inability to perform the work. As discussed above, this is supported in Plaintiff's medical record, where her providers repeatedly discuss this specific issue and where Plaintiff talks about looking for another job. Plaintiff also gave testimony that she was feeling very stressed at her job and found it difficult to manage the work. AR 50. When asked by the ALJ what was causing that stress, Plaintiff stated that "[i]t was mainly the supervisors and people" and she felt her supervisors were "attacking" her. AR 51. When asked how she felt like she was performing at the job, Plaintiff answered that she felt like she was doing an average job. AR 53. However, she

felt like she was let go because of being absent a lot, due to her stress and depression. AR 54. When asked if she had enough money in her household that she did not need to find a job at that time, Plaintiff answered "[y]es, my husband works." AR 54. Given this background, it was a rational conclusion for the ALJ to draw that Plaintiff's issues with her last job were primarily due to that specific work environment. Why a claimant may have stopped working is a valid consideration. *See Cullen v. Colvin*, No. 6:15-CV-00517-SI, 2016 WL 706232, at *4 (D. Or. Feb. 22, 2016) (citing *Bruton v. Massanari*, 268 F.3d 824, 833 (9th Cir. 2001)) (upholding ALJ's finding that Plaintiff stopped working for reasons other than disability because it was a rational interpretation of the evidence); *see also Skelton v. Berryhill*, No. 6:16-CV-00115-AA, 2017 WL 1752955, at *3 (D. Or. May 2, 2017); *Brown v. Colvin*, No. 3:13-CV-06061-KLS, 2014 WL 3891352, at *4 (W.D. Wash. Aug. 7, 2014). Thus, the ALJ could reasonably have concluded that the issues Plaintiff testified she had interacting with her supervisors and coworkers and absence due to stress could be eliminated with a much lower stress job with a different work environment as identified in the RFC, and therefore, the RFC did not have to reflect these additional restrictions.

In summary, the Court finds that the ALJ decision was well supported in the medical record and testimony. The ALJ did not misapply any legal standards or rules in his decision, and for the reasons stated above, substantial evidence supports the ALJ's RFC determination and ruling.

## IV. CONCLUSION

The Court finds that the ALJ's decision to deny Plaintiff's benefits is supported by substantial evidence. Accordingly, the court **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross motion for summary judgment be **GRANTED**.

This Report and Recommendation is submitted to the United States district judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the court and serve a copy on all parties on or before **February 11, 2020**.

The document should be captioned "Objections to Report and Recommendation." Any response to the objections shall be filed and served on or before **February 18, 2020**. The parties are advised that any failure to file objections within the specified time may waive the right to raise those objections on appeal of the court's order. *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991).

      **IT IS SO ORDERED.**

Dated: January 28, 2020

Hon. Nita L. Stormes
United States Magistrate Judge